UNITED STATES, Appellee

v.

Jacqueline BILLINGS, Specialist
U.S. Army, Appellant

No. 03-0568

Crim. App. No. 9900122

United States Court of Appeals for the Armed Forces

Argued February 8, 2005

Decided June 15, 2005

CRAWFORD, J., delivered the opinion of the Court, in which
GIERKE, C.J., and EFFRON and BAKER, JJ., joined. ERDMANN, J.,
filed a separate opinion, concurring in part and in the result.

Counsel

For Appellant: Captain Doug J. Choi (argued); Colonel Mark
Cremin, Colonel Robert D. Teetsel, Lieutenant Colonel Mark
Tellitocci, Major Allyson G. Lambert, and Captain Mary E. Card
(on brief).

For Appellee: Captain Michael D. Wallace (argued); Colonel
Steven T. Salata, Lieutenant Colonel Mark L. Johnson, Major
Natalie A. Kolb, and Captain Janine P. Felsman (on brief);
Lieutenant Colonel Margaret B. Baines.

Military Judge: Stephen R. Henley

**THIS OPINION IS SUBJECT TO REVISION BEFORE FINAL PUBLICATION.**

Judge CRAWFORD delivered the opinion of the Court.

Pursuant to her pleas, Appellant was convicted of carrying a concealed weapon, in violation of Article 134, Uniform Code of Military Justice (UCMJ), 10 U.S.C. § 934 (2000). Contrary to her pleas, a general court-martial comprising officer and enlisted members, convicted her of conspiracy to commit assault consummated by a battery (in violation of Article 81, UCMJ, 10 U.S.C. § 881 (2000)), conspiracy to commit robbery (in violation of Article 81), robbery with a firearm (in violation of Article 122, UCMJ, 10 U.S.C. § 922 (2000)), two specifications of assault consummated by a battery (in violation of Article 128, UCMJ, 10 U.S.C. § 928 (2000)), and engaging in organized criminal activity (in violation of Article 134). On January 14, 1999, she was sentenced to be dishonorably discharged and confined for twenty-seven years. She was credited with 726 days of confinement. The convening authority approved the adjudged sentence. The United States Army Court of Criminal Appeals affirmed the findings and sentence on June 13, 2003.

This Court granted review of the following issue:

WHETHER THE UNITED STATES ARMY COURT OF CRIMINAL APPEALS ERRED IN UPHOLDING THE MILITARY JUDGE'S DECISION TO (1) ACCEPT A JEWELER CALLED BY THE GOVERNMENT AS AN EXPERT IN "CARTIER WATCH IDENTIFICATION"; (2) ALLOW THAT JEWELER TO IDENTIFY A WATCH IN A PICTURE AS SOLID GOLD (RATHER THAN GOLD PLATE); AND (3) ALLOW THAT JEWELER TO TESTIFY THAT THE

WATCH IN ONE PICTURE IS THE SAME STYLE AS THE WATCH IN A DIFFERENT PICTURE.

We hold that, under the circumstances of this case, the military judge erred in allowing the jeweler to identify a watch as solid gold from a photograph. This error was harmless, however. Therefore, we affirm the decision of the Army Court of Criminal Appeals.

FACTS

Specialist Jacqueline Billings was the leader of a group in Killeen, Texas, known variously as the "Gangster Disciples" and as "Growth and Development." In the summer of 1997, the gang killed two people and committed a series of other offenses, including an armed robbery at the management office of the Monaghan Apartments. While Robert G. Monaghan and the apartment manager were bound, the Gangster Disciples stole approximately $2,500 in cash and absconded with Mr. Monaghan's gold watch, which he valued at $18,500. The police never recovered Mr. Monaghan's property.

At trial, the Government called several rank-and-file members of the Gangster Disciples as witnesses. The Government also produced two photographs of Appellant wearing a gold-colored watch that were admitted into evidence. The Government then called Mr. Monaghan to establish the value of his stolen watch by testifying that the watch depicted in a Cartier Tank

Française advertisement was identical to his watch.  Mr. Monaghan testified that he had bought the watch in Rome for the equivalent of just under $15,000.  He stated that it "was a bargain to [him] because here, in the States, that watch sells for $18,500.00 plus tax."  The Government also offered receipts to help establish the value of the watch.

The Government then called Floyd R. Pagel, a jeweler, as an expert witness.  Before Mr. Pagel testified, defense counsel asked for a hearing pursuant to Article 39(a), UCMJ, 10 U.S.C. § 839(a)(2000), to examine Mr. Pagel's qualifications, as well as the necessity of any expert testimony at all on the topic. At that hearing, the military judge denied the defense counsel's request for a full hearing pursuant to Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993), but did set limits on the scope of Mr. Pagel's testimony.  The military judge ruled that Mr. Pagel could describe characteristics of Cartier watches and state whether he recognized any of them in the watch Appellant was wearing in the Government's photographic exhibits but would not be allowed to say whether the watch pictured was a genuine Cartier watch.  The military judge expressly barred Mr. Pagel from stating whether the watch in the Government's photos was Mr. Monaghan's.

Mr. Pagel testified that he had been in the jewelry business for about twenty-five years.  He was largely self-

4

taught but had attended several training courses, and regularly read professional periodicals. He stated that he had been a member of the National Jewelers Association of Appraisers, a peer-elected group, for about four years. He conducted appraisals of jewelry in the course of his business, and insurance companies have accepted his appraisals to determine value.

Mr. Pagel testified that he attended professional watch shows and was familiar with Cartier watches. He described certain characteristics of those watches and stated that they were relatively easy to identify because of those features.

The trial counsel then asked Mr. Pagel to examine the Government's exhibits depicting Appellant and to tell the panel what to look for in determining whether the watch in those photos was a Cartier Tank Française. After an objection, defense counsel was permitted to voir dire Mr. Pagel.

During that questioning, Mr. Pagel admitted that he did not sell Cartier watches. He also admitted that he had never actually seen a Cartier Tank Française. Finally, he stated that he was not certified by the Gemological Institute of America, an organization that licenses jewelers who sell diamonds and colored stones. At the conclusion of this questioning, the trial counsel offered Mr. Pagel as an expert. Over defense

objection, the military judge recognized Mr. Pagel as an expert in the field of Cartier watch identification.

Mr. Pagel then examined the Government's photos of Appellant with the aid of a ten-power magnification loupe and stated that the watch reflected many of the unique characteristics of Cartier watches. He added that the color of the watch worn by Appellant in the photos suggested that it was solid gold, rather than gold plated. He based this conclusion partly on comparison with a watch worn by another person also shown in one of the Government's exhibits.

On cross-examination, Mr. Pagel admitted that he would not be surprised to learn of fake Tank Françaises. He stated that he rarely attempts to evaluate the quality of watches using photographs alone, and noted two specific drawbacks to identifying the watch solely from these photographs: lighting can distort the color of the metal, and the word "Cartier" is not visible on the watch in the photographs of Appellant.

### DISCUSSION

Military Rule of Evidence (M.R.E.) 702 governs testimony by expert witnesses. This Court reviews military judges' decisions regarding expert witnesses for abuse of discretion. See United States v. Griffin, 50 M.J. 278, 284 (1999); see also General Electric Co. v. Joiner, 522 U.S. 136, 139 (1997).

6

The granted issue here is divided into three parts.  We examine each in turn.

A.  Military Judge's Acceptance of Expert

This Court must determine whether the military judge was justified in concluding that Mr. Pagel had sufficient specialized knowledge to testify as to the characteristics of Cartier watches.  M.R.E. 702 states that:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Thus, an "expert" witness may testify if he or she is qualified and testimony in his or her area of knowledge would be helpful.  This Court asks the proponent of expert testimony to demonstrate that expert's qualifications by establishing the six factors articulated in United States v. Houser: (1) the qualifications of the expert; (2) the subject matter of the expert testimony; (3) the basis for the expert testimony; (4) the legal relevance of the evidence; (5) the reliability of the evidence; and (6) that the probative value of the expert's testimony outweighs the other considerations outlined in M.R.E. 403.  36 M.J. 392, 397 (C.M.A. 1993).  Houser slightly predates

7

Daubert and Kumho Tire Co. v. Carmichael, 526 U.S. 137 (1999), which made it clear that Daubert applied to nonscientific subjects like this one.  Houser, however, is consistent with the later cases, and this Court has continued to use the Houser factors in analyzing the admissibility of expert testimony.  See, e.g., United States v. Dimberio, 56 M.J. 20, 26 (C.A.A.F. 2001); Griffin, 50 M.J. at 284.

Addressing the first part of the granted issue, Appellant attacks Mr. Pagel's qualifications.  M.R.E. 702 does not require Mr. Pagel to have any formal training, but Appellant argues that Mr. Pagel does not even have any relevant experience:  he does not sell Cartier products and had never seen a Tank Française.  Appellant also points out that trial counsel handed Mr. Pagel the advertisement to look at while describing the unique characteristics of Cartier watches and asserts that it is impossible to know whether his testimony could have been as detailed without that aid.  Appellant contends that the panel easily could have performed the same analysis as Mr. Pagel and that therefore the military judge abused his discretion by qualifying Mr. Pagel as an expert.

During the Article 39(a) hearing before Mr. Pagel's testimony, the defense counsel had argued that "[trial counsel] should simply submit the pictures . . . and you let the jury go back there and look at it.  That's what juries are for, to

decide these kinds of issues." The military judge asked the trial counsel why the panel needed Mr. Pagel. The trial counsel replied that "what [Mr. Pagel] would give the panel is what to look for on which to base their opinion." The trial counsel gave several examples: the pattern of loops on the watch band, the size of the band in proportion to the face, the color of "real gold" as distinguished from gold plate, the distinctive color of the face and the use of Roman numerals, and the placement of a jewel on the watch's "stem."[1] The military judge ruled that Mr. Pagel could describe characteristics of Cartier watches and state whether he saw those characteristics in the watch worn by Appellant in the Government's photos, but would not be allowed to say whether the watch in those photos is a real Cartier watch.

Mr. Pagel is a jeweler, and the panel members presumably are not. It is safe to say that, even though he has little personal experience dealing with Cartier watches, Mr. Pagel's time in the industry has given him "specialized knowledge," in accordance with M.R.E. 702, that could assist the panel. As we explained in Houser, the test is not whether a jury could reach any conclusion without expert help, "but whether the jury is qualified without such testimony to determine intelligently and

---

[1] We note that Mr. Pagel consistently referred to the placement of a jewel on a watch's "crown" -- the term used by jewelers.

9

to the best possible degree the particular issue without enlightenment from those having a specialized understanding of the subject." Houser, 36 M.J. at 398 (citations and internal quotation marks omitted).

As Kumho Tire Co. emphasized, the trial judge enjoys a great deal of flexibility in his or her gatekeeping role: "the law grants a district court the same broad latitude when it decides how to determine reliability as it enjoys in respect to its ultimate reliability determination." 526 U.S. at 142. The military judge held an Article 39(a) hearing on the matter and came to a reasonable conclusion, based on Mr. Pagel's level of knowledge relative to that of the panel members. Therefore, he did not abuse his discretion in permitting Mr. Pagel to testify as an expert witness.

B. Evaluation of Gold From a Photograph

In considering the second and third parts of the granted issue, our analysis turns from Mr. Pagel's qualifications to his testimony itself. Appellant attacks both Mr. Pagel's method of evaluation and his conclusions.

The method in question here is the examination of a watch in photos, rather than a watch in one's hand. The military judge had decided earlier at the Article 39(a) hearing to allow Mr. Pagel "to relate what to look for in a Cartier watch, [including] . . . color and quality of the gold." Mr. Pagel

then testified that the color of the watch worn by Appellant in the photos suggested that it was "natural" or solid gold, rather than gold plated. Resolving this second portion of the granted issue, then, requires the Court to determine whether the military judge was justified in implicitly finding that this method would enable Mr. Pagel to derive "sufficient facts or data," M.R.E. 702, to distinguish solid gold from gold plate.

Appellant points out that Mr. Pagel admitted that evaluating gold from photos is not his usual technique and that lighting easily could distort the appearance of metals in photos. The Government argues that Mr. Pagel was, nevertheless, experienced enough to be able to distinguish solid gold from gold plate in this way. Appellant's objection, the Government contends, concerns the weight of the evidence, not its admissibility.

As with our consideration of the first granted issue, this Court must review the military judge's decision to allow the use of photos in this way for an abuse of discretion. Although Kumho Tire Co. and our own precedents suggest that a military judge is due a great deal of leeway, there clearly are significant drawbacks when he or she allows a witness to use photos to distinguish solid gold from gold plate. We hold that the military judge abused his discretion in allowing Mr. Pagel

11

to determine from photos that the watch Appellant wore in the Government's photographic exhibits was solid gold.

In Joiner, the Supreme Court emphasized that Daubert does not require a trial judge "to admit opinion evidence which is connected to existing data only by the ipse dixit of the expert. A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered." 522 U.S. at 146. Kumho Tire Co. emphasized the trial judge's "gatekeeping function" to "'ensure that any and all . . . [expert] testimony . . . is not only relevant, but reliable.'" Kumho Tire Co., 526 U.S. at 147 (quoting Daubert, 509 U.S. at 589). The Court observed that this gatekeeping function "applies not only to testimony based on 'scientific' knowledge, but also to testimony based on 'technical' and 'other specialized' knowledge." Id. at 141 (citing Fed. R. Evid. 702). When expert "testimony's factual basis, data, principles, methods, or their application are called sufficiently into question, . . . the trial judge must determine whether the testimony has 'a reliable basis in the knowledge and experience of [the relevant] discipline.'" Id. at 149 (quoting Daubert, 509 U.S. at 592) (bracketed alteration in original). The Court also stated in Kumho Tire Co. that "a trial court should consider the specific factors identified in Daubert where they

are reasonable measures of the reliability of expert testimony." 526 U.S. at 152.

Those four factors are: (1) whether a theory or technique can be or has been tested; (2) whether the theory or technique has been subjected to peer review and publication; (3) the known or potential rate of error in using a particular scientific technique and the standards controlling the technique's operation; and (4) whether the theory or technique has been generally accepted in the particular scientific field. Daubert, 509 U.S. at 593-94.

Our analysis of Mr. Pagel's testimony is concerned with the application of Kumho Tire Co. and the four Daubert factors to his method of distinguishing solid gold from gold plate based on a photograph.

Under Daubert, the proponent of expert testimony must be able to establish both the expert's qualifications and the reliability of the expert's basis for forming an opinion. "The proponent of evidence has the burden of showing that it is admissible." United States v. Palmer, 55 M.J. 205, 208 (C.A.A.F. 2001). The Government did not carry that burden. Instead, it relied on the mere "ipse dixit of the expert." Kumho Tire Co., 526 U.S. at 157.

The Government met none of the four Daubert criteria for determining the reliability of expert testimony, nor did it

identify any alternative indicia of reliability. The Government thus failed to satisfy its burden as the proponent of Mr. Pagel's testimony to establish his opinion's reliability.

The first Daubert factor is concerned with whether the technique can be, or has been, tested. 509 U.S. at 593. The Government presented no evidence that the method of distinguishing solid gold from gold plate on the basis of photographs has been tested.

The second Daubert factor focuses on whether the "technique has been subjected to peer review and publication." 509 U.S. at 593-94. The Government presented no evidence that the photographic distinction technique employed here had been peer reviewed or published.

The third Daubert factor looks to a technique's known or potential rate of error and whether standards exist to control the technique's operation. 509 U.S. at 594. The record contains no indication of whether or how often the photographic distinction technique would lead to an erroneous conclusion.

The fourth Daubert factor considers whether the technique enjoys general acceptance within the relevant expert community. 509 U.S. at 594. Again, the record is silent except for Mr. Pagel's own comment that "[t]here's not much call for" identification of gold from photos alone. Thus, nothing in the record supports the conclusion that Mr. Pagel's opinion was

14

based on a reliable technique.  The military judge, therefore, erred by allowing Mr. Pagel to offer his opinion that the watch worn by Appellant in the Government's photographic exhibits was solid gold rather than gold plate.

C. Testimony Comparing Watches in Photographs

In the third and final part of the granted issue, we are asked to determine whether the military judge abused his discretion when he permitted Mr. Pagel to point out Cartier characteristics in the Cartier advertisement, and then turn to the Government's photographic exhibits and indicate which of those characteristics could be found in the watch worn by Appellant in the photos.

Appellant argues that the fact that the photos of her were undated allows for no inference that she was involved in the robbery at all.  Also, she asserts, Mr. Pagel was too unfamiliar with the Cartier Tank Française to be able to identify such a watch reliably through photos alone.

The Government contends that Mr. Pagel was sufficiently familiar with the watch type in question.  It also argues that, in compliance with M.R.E. 401, Mr. Pagel's testimony made a fact of consequence -- Appellant's involvement in the robbery -- more probable than it would have been without that evidence.  The Government goes on to note that Mr. Pagel never testified that Appellant was wearing the watch stolen from Mr. Monaghan.  In

15

any event, the Government asserts, Appellant's arguments are relevant to the weight of the evidence, not its admissibility.

When this Court reviews a military judge's decision for an abuse of discretion, "[t]he challenged action must . . . be found to be 'arbitrary, fanciful, clearly unreasonable,' or 'clearly erroneous' in order to be invalidated on appeal." United States v. Miller, 46 M.J. 63, 65 (C.A.A.F. 1997)(quoting United States v. Travers, 25 M.J. 61, 62 (C.M.A. 1987)(citation omitted). Appellant is correct in her contention that Mr. Pagel was not an authority on the Tank Française. Nonetheless, as we have explained, his knowledge met the standard required by M.R.E. 702. Appellant's arguments are relevant to the weight of this evidence, rather than to its admissibility. The military judge did not abuse his discretion in permitting this testimony.

## DECISION

Appellant is correct in her contention that the military judge erred by allowing Mr. Pagel to testify on the identification of gold in a photograph. We hold that this error was harmless, however. We base our conclusion on a variety of factors.

First, Mr. Pagel's qualification as a witness did not result in any new photo evidence before the jury. The prosecution did not need Mr. Pagel to authenticate the Cartier advertisement or the photos of Appellant wearing a watch; all of

16

the prosecution's exhibits had been admitted by the time he began his testimony.

Next, defense counsel was able to explore that testimony. The voir dire and cross-examination[2] demonstrated the shortcomings of both Mr. Pagel's expertise and his method of comparison. As the Federal Rules of Evidence Advisory Committee explained:

> A review of the caselaw after Daubert shows that the rejection of expert testimony is the exception rather than the rule . . . . [T]he trial court's role as gatekeeper is not intended to serve as a replacement for the adversary system. As the Court in Daubert stated: "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence."

Fed. R. Evid. 702, advisory committee's note (discussion of 2000 amendments)(quoting Daubert, 509 U.S. at 595) (other internal quotation marks and citations omitted). Those "traditional and appropriate means" were available to Appellant as weapons against Mr. Pagel's testimony. It appears that defense counsel used them energetically.

Perhaps most important, the Government marshaled a variety of strong evidence, including Mr. Pagel's testimony, against Appellant on this charge. For example, the Government produced several witnesses to describe the actions that resulted in the theft of Mr. Monaghan's watch. They stated that Appellant was

---

[2] Some cases may require a Daubert hearing, as well.

the leader of the Gangster Disciples' local chapter, that no member of the Gangster Disciples will undertake action without the approval of his or her leader, that Appellant was aware of the robbery, and that, when a robbery yielded a major trophy, such as a gold watch, it would go to the senior leader. The Government then introduced Mr. Monaghan's receipts to prove the value of the stolen watch.

As we stated in United States v. Thomas, "we need not decide whether the military judge properly performed his gatekeeping function, because any error in admitting this evidence was harmless in light of the overwhelming evidence against appellant." 49 M.J. 200, 204 (C.A.A.F. 1998)(citing Article 59(a), UCMJ, 10 U.S.C. § 859(a)).

The decision of the United States Army Court of Criminal Appeals is affirmed.

ERDMANN, Judge (concurring in part and in the result):

I agree with the majority that the military judge erred by allowing Mr. Pagel to testify that the metal reflected in a photograph was solid gold rather than gold plate. Further, I agree that any error in Mr. Pagel's testimony was harmless in light of the abundant evidence supporting the charge of robbery.

I respectfully disagree, however, that Mr. Pagel possessed the necessary expertise in either Cartier products or in the Cartier Tank Française watch in particular to render expert opinions about the characteristics of Cartier products. While Mr. Pagel was a jeweler and had some passing familiarity with Cartier watches, he did not deal in Cartier products and testified that he had not seen the particular model Cartier watch he was asked to identify. A Buick car dealer may be an expert in Buicks, but that does not necessarily make him an expert on a Mercedes SL600 Roadster, particularly if he has never even seen a SL600 Roadster before. In my view, Mr. Pagel did not possess specialized "knowledge, skill, experience, training, or education" to support a claim that he was an expert in Cartier products or in the Cartier Tank Française watch in particular. Military Rule of Evidence 702.

1

Nor do I believe that his testimony on the characteristics of the Cartier watch was necessary.  The members of the court could have just as easily examined the Cartier advertisement and the photograph of the watch worn by Billings and drawn their own conclusions.  The members were "qualified without such testimony 'to determine intelligently and to the best possible degree the particular issue.'"  United States v. Houser, 36 M.J. 392, 398 (C.M.A. 1993) (quoting State v. Chapple, 135 P.2d 1208, 1219-20 (Ariz. 1983)).  The members had no need for alleged expert assistance in comparing two photographs and determining whether the watches depicted were the same or similar.

Although I believe that the military judge abused his discretion in qualifying Mr. Pagel as an expert and in admitting his testimony as a whole, I agree that any error in this respect was harmless.  Billings's criminal liability for robbery flowed from her status as a co-conspirator.  See Manual for Courts-Martial, United States (2002 ed.), pt. IV, ¶ 5c(5).  There was substantial evidence of a conspiracy and that Billings was a member of the conspiracy:  Billings was the leader of the Gangsters Disciples at Fort Hood and directed the activities of the gang; she was present when the robbery of the Monaghan

Properties office was discussed by the gang; gang members committed the robbery; and Mr. Monaghan testified that his Cartier Tank Française watch was stolen during the robbery and he identified a photo of a Tank Française watch as an exact picture of the watch that was stolen. The testimony about solid gold versus gold plate and the "expert" picture comparison of watches was unnecessary.